# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3069

MALINEE YINDEE,

*Plaintiff-Appellant,*

*v.*

CCH INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 C 730—**Charles P. Kocoras**, *Judge.*

ARGUED MAY 11, 2006—DECIDED AUGUST 11, 2006

Before POSNER, EASTERBROOK, and WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Malinee Yindee was hired
in 2000 as a "Programmer Analyst" to work with a database
system that CCH used in its business. She was fired three
years later. A considerable part of the time in between had
been spent on leave (whether paid disability leave or unpaid
leave under the Family and Medical Leave Act) because of
cancer and other ailments. Yindee's endometrial carcinoma
led to a hysterectomy; she also suffers from vertigo and
related problems such as frequent headaches. She attrib-
utes her discharge to these conditions (which she says CCH
failed to accommodate) and to retaliation after she com-
plained. CCH contends that it tried to accommodate Yindee
and that the discharge stemmed from a decline in her

performance. In this suit under the Americans with Disabilities Act, the district judge granted summary judgment to CCH. See 2005 U.S. Dist. LEXIS 12769 (N.D. Ill. June 16, 2005).

The district judge concluded that Yindee is not disabled—she no longer has cancer, and her vertigo, which for about a year prevented her from driving, is not a disability under the approach of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). That left the retaliation claim, which the judge rejected because the evidence does "not lead inexorably to a conclusion that CCH retaliated against [Yindee] once she began filing grievances and EEOC charges." This analysis is faulty in two respects. The price of curing Yindee's cancer and saving her life was sterility, which assuredly is a "disability" under the ADA. See *Bragdon v. Abbott*, 524 U.S. 624 (1998); 29 C.F.R. §1630.2(h)(1). And Yindee need not show that the evidence "inexorably" supports her position. Cf. *Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195 (2006) (holding that a court of appeals erred by demanding evidence that "jumps off the page and slaps you in the face"). "Inexorability" is not required even in a criminal prosecution. It is enough to show (when responding to a motion for summary judgment) that a reasonable jury could find by a preponderance of the evidence in favor of the party opposing the motion. See *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Neither of these mistakes matters, however. Appellate review of a decision granting summary judgment is plenary, so we can (and will) make an independent decision under the proper standards.

Yindee's infertility is a disability, but nothing in the record implies that CCH held it against her. Her hysterectomy was performed in 2000, and the events of which she complains did not begin until 2002. Yindee did not ask for time off, or any other accommodation, so that she could adopt children. Cf. *Erickson v. Board of Governors of*

*Northeastern Illinois University*, 207 F.3d 945 (7th Cir. 2000) (employee sought accommodation for medical and emotional problems related to fertility treatments).

When Yindee first sought an accommodation in 2002, it was on account of difficulty in reaching the office after her vertigo worsened and her physician told her to stop driving. Yindee proposed to work at home; CCH agreed to a telecommuting arrangement. Yindee stayed home for three weeks and split time between home and office for another ten weeks, using taxis or public transportation to commute. At the end of this three-month experiment, however, CCH concluded that Yindee was not being productive and insisted that she return to its offices full time.

The district judge concluded that vertigo is not a disability because "driving" is not a major life activity and balance problems did not themselves prevent Yindee from doing her job, or for that matter most other jobs. See *Sinkler v. Midwest Property Management LP*, 209 F.3d 678, 685 (7th Cir. 2000); *Chenoweth v. Hillsborough*, 250 F.3d 1328, 1329-30 (11th Cir. 2001). Yindee does not disagree with this assessment but instead maintains that the vertigo is an aspect of a single disability caused by cancer. Yet her own physician calls the vertigo idiopathic—that is, a symptom without a known cause. Because no evidence in the record would allow a reasonable jury to find that Yindee's vertigo is an aspect of her genuine disability (infertility), she does not have a sound claim of disability discrimination under the ADA. (This means that we need not decide whether a medical condition or symptom associated with a disability must be accommodated independently, when the associated condition is not serious enough to be a disability on its own.)

That leaves the retaliation theory. See *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006); *Washington v. Illinois Department of Revenue*, 420 F.3d 658

(7th Cir. 2005); *Sylvester v. SOS Children's Villages Illinois, Inc.*, No. 05-4219 (7th Cir. July 12, 2006). Yindee filed three charges with the EEOC. The first came on September 17, 2002, after CCH had ended the telecommuting arrangement and informed Yindee that her performance was substandard. The second came on December 12, 2002, after Yindee had been told that she was at risk of discharge unless she successfully completed a performance improvement plan. The third, on January 23, 2003, asserted that she had been fired six days earlier in retaliation for the charge made in December. She never argued (at least not before the EEOC) that the discharge was a response to September's charge—but, even if she had, there would be problems in making a prima facie case, for by September Yindee's job already was in jeopardy. We do not have a situation in which a worker with an unblemished record complains about discrimination and suddenly finds herself in hot water.

Let us suppose, however, that a prima facie case of retaliation has been made out, on the theory that CCH may have been retaliating for Yindee's request to telecommute as an accommodation of her vertigo, or perhaps an internal grievance that Yindee filed in August 2002 (though that grievance did not allege disability discrimination, so it is hard to see how it could be the foundation of a retaliation claim under the ADA). When telecommuting began, her paper record was stronger (though not as good as it had been in 2000). We bypass the question whether Yindee has shown that some comparable employee received better treatment and turn to the employer's explanation—for, once a non-retaliatory explanation has been articulated, the plaintiff must show that this explanation is a pretext for discrimination. To do this the employee must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. See *Forrester v. Rauland-Borg Corp.*, No. 05-4650 (7th Cir. June 29, 2006) (collecting authority); *Pollard v. Rea Magnet Wire Corp.*, 824 F.2d 557 (7th Cir. 1987). Poor personnel management receives its comeuppance in the market rather than the courts.

CCH's explanation is that Yindee not only reduced the quantity of output in 2002 but also fell behind on quality. Deadlines for her projects passed and other employees had to step in. Supervisors also concluded that Yindee had not kept up with the latest version of the database package, and that when she failed to understand how the software worked she called PeopleSoft to complain about bugs and missing features rather than learning how the problem could be solved.

One feature of the performance improvement plan required Yindee to master the software package so that she could solve problems correctly rather than call tech support at PeopleSoft. This was the immediate cause of her discharge, according to CCH. On January 15, 2003, Yindee sent an email to Tennant asking whether she should call PeopleSoft about a problem that she perceived in the software and its documentation. Tennant concluded that Yindee had misunderstood either the software or the manual, had failed to demonstrate problem-solving skills essential to her job, and recommended that she be dismissed, which CCH soon did.

Yindee has not even attempted to demonstrate that Tennant is lying about his assessment of her work and the reason for his recommendation. She does not, for example, contend that the software or its manual *was* deficient in the way her email of January 15 claimed (from which, if true, it might be inferred that Tennant's contrary assertion had

been trumped up). Nor does she contend that she completed projects on time (or at all) during the period between the start of telecommuting in April 2002 and her discharge in January 2003. Her arguments are entirely procedural. She complains, for example, that CCH fired her before the prescribed end of the performance plan, as if federal law gave employees a right to serve out some minimum time under probation. She also contends that because her home computer was logged onto CCH's network for an average of six hours a day while she was telecommuting, CCH should have been satisfied. Yet that's like saying that as long as an employee shows up at the office, the employer can't complain when she puts her feet up on the desk and does sudoku puzzles all day. Yindee was being paid to do programming, and if she didn't accomplish assigned projects it made no difference how many hours per day her computer was a node on the firm's network. The poor performance continued after the telecommuting ended—or so CCH maintains, and Yindee, who bears the burdens of production and persuasion after the employer articulates a nondiscriminatory explanation, has offered nothing in response.

CCH's explanation of its decision thus stands uncontradicted. Tennant may have acted precipitately. He may have been wrong in denigrating Yindee's skills or productivity. But on this record a reasonable jury could not find that he lied to the court about his reasons. Yindee has not created a material dispute about the pretext question, so CCH is entitled to prevail as a matter of law.

AFFIRMED

No. 05-3069 7

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*