In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1547

RJB PROPERTIES, INC.,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5226—**Robert W. Gettleman**, *Judge.*

ARGUED SEPTEMBER 29, 2006—DECIDED NOVEMBER 15, 2006

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS, *Circuit Judges.*

FLAUM, *Chief Judge.* Shortly after the City of Chicago's Board of Education (the Board) denied RJB Properties, Inc. (RJB) two contracts to provide janitorial services, RJB sued the Board, claiming that the Board's decision violated RJB's equal protection and procedural due process rights. The district court granted the Board's motion for summary judgment, concluding that RJB had not offered evidence from which a jury reasonably could find that the Board's decision was irrational or that the Board deprived RJB of a liberty interest. RJB appeals the district court's ruling. For the following reasons, we affirm.

## I. Background

RJB is a minority-owned business principally located in Orland Park, Illinois. It has done business with the Board since 1987 and is owned by Ronald Blackstone.

Between 1993 and 2000, the Board awarded RJB more than $18 million in milk contracts to provide milk to the Chicago Public Schools (CPS). On January 31, 2000, the Board's Office of the Inspector General (OIG) interviewed Blackstone, specifically inquiring about RJB's role as a prime contractor and as a minority business enterprise (MBE) subcontractor for Nick's Dairy Service, another one of the Board's milk providers. According to the OIG's interview summary, Blackstone admitted that his company was not a dairy, owned no milk delivery trucks, milk drivers, or milk storage facilities, and merely acted as a broker for other companies. To bid on milk contracts, Blackstone said that he contacted Chicago-area dairies, obtained a quote for milk, and contacted a distributer to determine a price for shipping costs. Based on these price quotes, he calculated and submitted a bid price.

The interview summary also stated that OIG investigators asked Blackstone to name the company that paid RJB for the services it provided as an MBE subcontractor for Nick's Dairy. Initially, Blackstone said that Nick's Dairy paid RJB, but he later said that RJB received payment from another company, McMahon's Dairy. Blackstone also told investigators that RJB did not submit invoices to Nick's Dairy or McMahon's Dairy, and he refused to provide information concerning the frequency or amount of payments RJB received from those companies. The OIG told Blackstone that under the terms of the Nick's Dairy contract, RJB was required to verify that it received the money it was due as an MBE subcontractor. Nevertheless, Blackstone persisted in his refusal, claiming that he furnished statements to the CPS Bureau of Affirmative

Action declaring that RJB received all of the money due under the contract.

On March 28, 2001, the OIG issued a report discussing its investigation into RJB's dealings with the Board. The report said that RJB signed a milk contract agreeing to furnish milk and milk products and to participate directly in the contract, but instead only acted as a broker, arranging for other companies to produce and deliver milk to CPS. The report also said that McMahon's Dairy did not provide RJB with settlement or accounting sheets documenting the payments it made; that Blackstone "refused to give any information concerning the frequency or amount of payments he ha[d] received as a sub[contractor] to Nick['s Dairy]"; that Blackstone "refused to answer questions posed in a subsequent interview with a court reporter"; and that after RJB obtained a CPS contract to provide 1% and 2% milk to schools, RJB exclusively delivered more expensive 1% milk without CPS's authorization. The March 28, 2001 report never came to a definitive conclusion about whether RJB engaged in misconduct because the OIG was unable to obtain documents— such as contracts, leases, and financial records—concerning RJB's relationship with Nick's Dairy and McMahon's Dairy.[1]

During 2003 and 2004, the OIG conducted a separate investigation into Preferred Meals Systems, Inc. (Preferred), another food services company, to determine whether it had complied with a contractual provision requiring it to use MBE subcontractors that perform a

---

[1] Blackstone told the OIG that McMahon's possessed all of the documents related to his participation in the Nick's Dairy contract. As a result, the OIG initiated a lawsuit against McMahon's seeking to enforce an administrative subpoena demanding the records. By time the OIG issued its March 28, 2001 report, however, the lawsuit was still pending. The case was eventually dismissed for reasons not disclosed in the record.

commercially independent function. As part of that investigation, the OIG interviewed Richard Thomas, the president of T&T Foodservices, Inc., a minority-owned food distributer. According to the OIG's interview summary, Thomas said that in 2002 someone at Preferred contacted him about acting as a subcontractor for one of Preferred's CPS contracts, because RJB had "gotten into some trouble and had to drop out of Preferred's contract with CPS." Def. Ex. A. Thomas also said that Preferred offered T&T the same deal it had with RJB, which was to get paid for doing very little.

On September 17, 2003, the Board issued a request for proposals (RFP) to provide janitorial services at the Board's 620 schools, and on November 17, 2003, RJB submitted a timely bid. On March 15, 2004, the Board's Professional Custodial Management Evaluation Team recommended that the Board award RJB one of the contracts. On May 19, Sean Murphy, who was then the Board's Chief Purchasing Officer, met with Michael Scott, the Board President, and presented the Evaluation Team's March 15 report. Scott asked whether Murphy was aware of any past issues regarding RJB's contract performance. Murphy said that he was not aware of any such issues but promised to investigate whether such issues existed. After the meeting, Murphy looked into RJB's history of doing business with the Board and read the OIG's March 28, 2001 and April 23, 2004 reports.

On May 26, 2004, the Board had a closed-session meeting and discussed the janitorial contracts. During the meeting, Murphy exchanged a number of e-mail messages via his Blackberry with Lynne Moore, the Board's Director of Facility Maintenance. Murphy indicated that he might be willing to let RJB slide because three years had elapsed since the OIG issued its reports. Moore initially responded that the Board's Law Department had "O.K.'d RJB" but later wrote that one of the Board's lawyers thought that

RJB was "shady" and that if the Board awarded RJB a part of the contract, "OIG would for sure investigate and dig for dirt." Murphy responded, "O.K. Stay with the original plan. That email was exactly what I needed. Thank you!" Murphy testified in his deposition that the original plan was to eliminate RJB from consideration during the closed-session meeting. Shortly after the e-mail exchange with Moore, Murphy recommended against hiring RJB, and the Board followed his recommendation.

On April 7, 2004, the Board issued and advertised a second RFP for janitorial services at 125 S. Clark Street in Chicago, Illinois. On April 28, RJB submitted a bid. On June 3, the Board's Procurement Department issued a memorandum noting that the Board had considered RJB the front-runner for the first janitorial services contract but later determined that RJB was "non-responsible" based on the March 28, 2001 OIG report. Pl. Supp. App. at 87-88. On June 11, 2004, the Board sent RJB a letter informing it that the Board was no longer considering RJB's first proposal (dated November 17, 2003). On July 1, 2004, the Board awarded janitorial contracts to companies named A&R, Total Facility, and We Clean.

On October 1, 2004, the Board sent RJB a letter stating that the Board was no longer considering RJB's second proposal (dated April 28, 2004). According to Board Chief Purchasing Officer Heather Obora, the letter was a standard "will not award letter," which encouraged RJB to continue participating in the RFP process. The letter did not inform RJB that the Board had found it non-responsible. RJB has not performed any work for the Board since the Board denied RJB the two janitorial contracts.

On August 17, 2005, the Board awarded a multi-million dollar milk contract to a joint-venture called C&M JV1. According to Obora's testimony, Nick's Dairy and McMahon's Dairy might be, and Bareman's Dairy probably is, a part of C&M JV1.

RJB filed its original complaint on August 9, 2004 and a second amended complaint on August 1, 2005, which alleged a "class of one" equal protection claim, a procedural due process claim, and a state law claim that is not part of this appeal. The district court granted the Board's motion for summary judgment on RJB's equal protection and procedural due process claims. It concluded that the Board had a rational reason for not awarding RJB contracts and that RJB had not demonstrated a genuine issue of material fact with regard to whether the Board had deprived it of a liberty or property interest.

## II. Analysis

The Court reviews de novo the district court's entry of summary judgment. *See Lee v. Keith*, 463 F.3d 763, 767 (7th Cir. 2006). Under Federal Rule of Civil Procedure 56(c), a party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, summary judgment is proper if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In other words, to survive the Board's summary judgment motion, RJB had to offer evidence from which a jury reasonably could find in its favor. *See Yindee v. CCH, Inc.*, 458 F.3d 599, 601 (7th Cir. 2006).

### A. Equal Protection

RJB contends that the district court erred by granting the Board summary judgment on RJB's "class of one" equal protection claim. "The purpose of the Equal Protection Clause of the Fourteenth Amendment is to 'secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006) (quoting *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). Where, as in this case, the plaintiff's claim does not involve a fundamental right or a suspect classification, the Court evaluates the claim under rational basis review. *Id.*

To succeed on a "class of one" equal protection claim, a plaintiff must prove that the State, without rational reason, treated it differently from other similarly situated entities.[2] *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002). The plaintiff bears a "very significant burden" of offering evidence that other entities are similarly situated in all relevant respects. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003). The plaintiff's evidence must be such that it allows a reasonable jury to "eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 282; *see also Racine Charter One*, 424 F.3d at 683; *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1003 (7th Cir. 2004); *Bell v. Duperrault*, 367 F.3d 703, 708

---

[2] The Court has noted that a "class of one" equal protection claim may also require a plaintiff to prove one additional element: that the State acted with an illegitimate animus. *See Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 683-84 (7th Cir. 2005). As in *Racine Charter One*, we need not decide whether such a requirement exists, because RJB has not offered evidence satisfying the less demanding standard.

(7th Cir. 2004); *Purze v. Vill. of Winthrop Harbor,* 286 F.3d 452, 455 (7th Cir. 2002).

RJB has not pointed to a similarly situated company that the Board treated more favorably. Though RJB has offered evidence that the Board continues to do business with other companies that the OIG investigated for misconduct, RJB has not pointed to a company that has been accused of the same types of wrongdoing. The OIG's March 28, 2001 report suggested that RJB was involved in a wide range of suspicious activity: performing no "commercially independent function" as an MBE subcontractor; refusing to provide information about income it received as a subcontractor for Nick's Dairy; overcharging the Board for milk; passing money designated for an MBE to a majority owned company; and making fraudulent misrepresentations in contractor disclosure documents. *See* Pl. Supp. App. 46-48. The OIG also accused McMahon's and Nick's Dairy of overcharging and not turning over documents, but RJB has not offered evidence that the OIG accused those companies of entering milk contracts without possessing the equipment to perform on those contracts or making fraudulent statements on contractor disclosure documents. In the same vein, the Board awarded contracts to Preferred, Total Facility, and T&T, companies that the OIG also accused of wrongdoing, but RJB has not offered evidence that the OIG accused those companies of overcharging or refusing to turn over documents.

Because OIG's allegations about RJB were different than those leveled against other companies, the Board had a rational reason to treat RJB differently. *See Bell*, 367 F.3d at 708 (holding that individuals were not similarly situated where they submitted applications for pier extensions at different times, requested different extensions, or requested to replace existing structures rather than build new ones). Indeed, the Board rationally could have concluded that the OIG's unique (and more numerous) allega-

tions against RJB made RJB more likely to engage in future misconduct and less likely to perform the janitorial contract to the Board's satisfaction.

RJB contends that the reasons the Board now provides for not selecting it to perform the two janitorial contracts are not the same as the ones provided by Sean Murphy in his e-mail exchange with Lynne Moore just before the Board made its decision. However, even assuming that the government's present reasons for its decision are different from those it previously provided, this change in position has no bearing on whether the Board acted rationally. Under rational basis review, "the plaintiff has the burden of proving the government's action irrational," and "[t]he government may defend the rationality of its action on any ground it can muster, not just the one articulated at the time of decision." *See Smith*, 457 F.3d at 652.

RJB also maintains that it never overcharged for milk, refused to turn over documents, or acted as a minority pass-through company. This argument also misses the point. Regardless of whether RJB actually engaged in wrongdoing, the OIG suspected it of wrongdoing, and that is enough to justify the Board's decision not to do business with them. The government does not violate the Equal Protection Clause by making decisions based on rational suspicions not confirmed by evidence satisfying some burden of proof. *See Vaughn v. Sullivan*, 83 F.3d 907, 913 (7th Cir. 1996) (stating, in the context of rational basis review, that "a legislative decision 'may be based on rational speculation unsupported by evidence or empirical data.'") (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

### B. Procedural Due Process

RJB also contends that the district court erred by granting summary judgment on its procedural due process claim. To demonstrate a procedural due process violation, a plaintiff must prove that the State deprived it of a protected liberty or property interest and failed to provide adequate process. *See Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002).

RJB maintains that the Board deprived it of a liberty interest in its good name, reputation, honor, or integrity, so that it was foreclosed from obtaining employment opportunities. *See Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir. 1993). To prove a deprivation of this liberty interest, a plaintiff must establish that the defendant publicly disclosed stigmatizing information that caused the plaintiff to suffer a tangible loss of other employment opportunities. *See Harris v. City of Auburn*, 27 F.3d 1284, 1286 (7th Cir. 1994). "In such cases, the employee's good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001).

The district court ruled that RJB had not offered evidence indicating that the Board publicly disclosed stigmatizing information or that the Board precluded RJB from pursuing its desired employment field. RJB's only argument in response is that the Board disseminated stigmatizing information by placing it in documents available to the public under the Illinois Freedom of Information Act. This Court has held, however, that information is not publicly disseminated where it may be, but has not yet been, disclosed to third parties. *See Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997); *Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) ("[T]he mere existence of damaging information in Johnson's personnel file cannot give rise to

a due process challenge.") (citing *Clark v. Maurer*, 824 F.2d 565, 566 (7th Cir. 1987)). Because RJB has not offered evidence that the Board actually disseminated stigmatizing information to the public—only that the Board made stigmatizing information available in a file—no jury reasonably could find that the Board deprived RJB of a liberty interest. Accordingly, the district court correctly granted the Board's motion for summary judgment on RJB's procedural due process claim.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling.

A true Copy:

　　　Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*