In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1775

KATHERINE LIU,

*Plaintiff-Appellant,*

*v.*

COOK COUNTY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 6544 — **George M. Marovich**, *Judge.*

ARGUED SEPTEMBER 9, 2015 — DECIDED MARCH 15, 2016

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Dr. Katherine Liu worked as a general surgeon at Cook County's Stroger Hospital for more than two decades before she lost her surgical privileges and was denied reappointment in 2008. Cook County and the three individual defendants, Dr. Richard Keen, Dr. James Madura, and the estate of Dr. Phillip Donahue, contend that those actions were based on Dr. Liu's repeated refusal to operate on patients with appendicitis. Dr. Liu claims that their

reasoning masked unlawful discrimination and retaliation. She brought a number of claims against defendants, including alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) & 2000e-3(a), and 42 U.S.C. § 1981.

The district court granted defendants' motion for summary judgment, finding that no reasonable trier of fact could conclude their reasons were pretextual. We agree. Dr. Liu has presented only the sparsest evidence of animus based on her race, sex, and national origin, none of it linked to the decisions at issue. She has also failed to present evidence creating a genuine dispute of fact as to whether the defendants' stated reasons for disciplining her were honest. We therefore affirm the decision of the district court.

I. *Background*

A. *Facts for Summary Judgment*

In assessing whether the defendants were entitled to summary judgment, we examine the record in the light most favorable to Dr. Liu as the non-moving party, resolve all evidentiary conflicts in her favor, and grant her all reasonable inferences that the record permits. *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012).

1. *The Parties*

Dr. Katherine Liu is an Asian woman of Chinese descent. She began working at Stroger Hospital in 1984. With the exception of 1985, when she received a "good" performance appraisal from the Department of Surgery, she consistently received ratings of "excellent" and "superior" up until annual appraisals were discontinued in 1999.

As for the individual defendants, Dr. Keen was Chairman of the Department of Surgery. Dr. Madura was Chair of the Surgical Oversight Committee, or SOC. Dr. Donahue was Chief of the Division of General Surgery. All three had managerial responsibilities related to patient care at Stroger.

In 2001, a patient at Stroger died from a ruptured appendix. That tragedy prompted Dr. Keen to write to the Hospital Surgical Oversight Committee advising that as a corrective action the Department of Surgery would admit patients with abdominal pain to surgical service so the hospital could recognize problems requiring surgery and operate on them early. This pro-surgery approach set the stage for the eventual conflict between the defendants and Dr. Liu.

### 2. *Early Disputes*

Dr. Liu says that the discrimination began in 2003, when Drs. Keen and Donahue began sending a disproportionate number of her cases to review committees as compared to her white male colleagues. Her declaration does not provide enough detail about her colleagues to support the claim of disproportionality, but she says that throughout 2003 and 2004, she met with Dr. Bradley Langer, the interim Medical Director at the time, to discuss the disparities she perceived. She has offered no direct evidence that Drs. Keen and Madura harbored animus toward her based on race, sex, or national origin. As for Dr. Donahue, Dr. Liu points to a handful of inappropriate remarks he made, including: (1) in 2000, he called her a "good girl" until she asked him to stop; (2) when she requested a raise, he asked why she needed one because her husband worked; and (3) he asked Dr. Susan Gilkey outside of Dr. Liu's presence why all female doctors "have to be bitches."

3.  *The Appendicitis Cases*

In December 2004, the SOC discussed a case in which Dr. Liu treated a nineteen-year-old patient with appendicitis non-operatively and the patient suffered a heart attack. The minutes indicated that "Timing of operating was delayed" and that Dr. Donahue would "counsel Dr. Liu regarding treatment of appendicitis." The minutes also stated, however, that "Dr. Liu's care was deemed adequate."

This was the first in a series of clashes between Dr. Liu and the Stroger Hospital administration regarding her professional judgment as it pertained to the non-operative treatment of appendicitis.[1] On April 7, 2005, the SOC met and discussed I.G., a patient who presented with appendicitis and whom Dr. Liu treated non-operatively. The minutes stated in part:

> Dr. Donahue has counseled Dr. Liu (who is the Attending surgeon) about her method of treating appendicitis by antibiotics only without initial surgical intervention as being non-conventional. If Dr. Liu is going to treat acute appendicitis w/ antibiotics, then it has been requested that it be done in a prospective manner under research protocol with IRB approval.

---

[1] Dr. Liu also received some criticism for non-appendicitis cases over the next few years, including a reprimand for delaying an operation in October 2006, an SOC review of a patient with a "subclinical dehiscence," or partial separation of a previously closed incision, in the same month, an order restricting her ability to handle esophageal cases in February 2007, and a reprimand in August 2007 for a gastroesophagectomy she performed. She says all these criticisms were unjustified. The non-appendicitis cases do not play a role in our decision.

There was no further discussion necessary, because the care was deemed appropriate in this case.

In December 2006, the SOC discussed another of Dr. Liu's appendicitis cases. The minutes contained little detail about the case itself, but the consensus was "that the management process was not adequate; deficient care." Dr. Liu was supposed to be invited to the next meeting to offer her own views on the case, but she says that never occurred.

In May 2007, Dr. Madura wrote to Dr. Donahue after attending a Mortality and Morbidity Conference. The conference featured a case involving a 25-year-old male patient, J.E., who presented with twelve hours of right lower quadrant pain, elevated white blood cell count, and a CT scan clearly showing acute appendicitis with a fecalith (a hardened mass of feces). Dr. Liu treated him with antibiotics and did not perform surgery. Seven to ten days later, the patient returned with an abscess and spent several days in the hospital. According to Dr. Madura, the audience unanimously agreed that J.E. should have received an operation when first admitted. He wrote that he was concerned that Dr. Liu was deviating from the standard of care for research purposes and that he was referring the J.E. case to the SOC.

Before the SOC reviewed the case, Dr. Keen received a letter from resident physician Dr. Niki Christopoulos expressing similar concerns about the management of J.E.'s case. Dr. Christopoulos wrote that J.E. had "begged" for an operation during his first admission, but that Dr. Liu had decided to manage his case non-operatively. Dr. Christopoulos believed Dr. Liu had "grossly mismanaged" the case.

The SOC reviewed the J.E. case twice, on June 7 and July 19, 2007. It recorded the following list of issues in its minutes for both meetings:

1.      No protocol for antibiotic management

2.      Patient is not advised of surgical vs. antibiotic management.

3.      Misinterpretation of data

4.      Inconsistency with resident & Attending reports.

5.      Failure to treat non-improving condition.

The SOC decided to send a letter to the Division Chief regarding "Dr. Liu's ongoing mismanagement of appendicitis calling for corrective action/disciplinary action." It also considered recommending that Dr. Liu be sent to Peer Review, although it put the vote on hold until Dr. Liu could present her side of the case.

On September 6, 2007, the SOC met to discuss several of Dr. Liu's cases. The SOC had previously discussed two of them, I.G. and J.E. A third appendicitis case was erroneously attributed to Dr. Liu but actually belonged to a different physician. A fourth was unrelated to non-operative appendicitis treatment but instead involved Dr. Liu's failure to diagnose a patient with cancer. The SOC agreed to generate a letter to Drs. Donahue and Keen expressing its view that Dr. Liu's care and management of appendicitis were deficient and recommending a reprimand. Dr. Madura read the letter addressed to Dr. Donahue at an SOC meeting on October 4, 2007.

On October 16, 2007, Dr. Donahue wrote Dr. Liu regarding her approach to appendicitis. He proposed that in cases of acute appendicitis, she simply perform an appendectomy, and, if she believed operation was inappropriate, she consult with a colleague. Dr. Liu responded via letter dated November 8, 2007. She defended non-operative appendicitis treatment as medically sound and wrote that she did not recall Dr. Donahue requesting that she operate on all cases of suspected acute appendicitis. She further wrote that she would have proceeded to surgery immediately if she had previously understood his position. She professed to be willing to follow Dr. Donahue's request that "all cases of suspected uncomplicated acute appendicitis in our institution receive surgery," at least pending the development of a formal protocol for non-operative management.

Four days later, Dr. Madura wrote a letter to Dr. Donahue about three additional cases purportedly involving Dr. Liu's non-operative treatment of appendicitis. (Dr. Liu contends just one of the patients actually had appendicitis.) So Dr. Donahue wrote Dr. Liu again on November 16, citing wasted resources and increased morbidity risk when appendicitis was treated without surgery. He instructed her to develop a protocol for non-operative management of appendicitis if she believed it appropriate. He also warned her that failure to comply with division policies would lead to censure. At Dr. Keen's request, Dr. Madura conducted a departmental quality control project comparing operative and non-operative appendicitis treatment in nearly 1,200 past appendicitis cases at Stroger. He concluded that acute appendicitis required urgent surgery. Dr. Liu was notified of this recommendation.

Nevertheless, on January 14, 2008, Dr. Madura discovered the case of F.G., another appendicitis patient whom Dr. Liu treated with antibiotics. He wrote to Drs. Donahue and Keen that he believed F.G.'s care was "inappropriately managed" and concluded: "It is only a matter of time before a tragic outcome results from this problem." Dr. Donahue wrote to Dr. Liu on February 22:

> Following an earlier note in which I asked that you desist from your practice of experimental treatment of acute appendicitis[,] I was disappointed when your case of a similar nature was presented at morbidity conference, since the young patient had additional CAT scans and unnecessary hospital days. Also, the young man has his diseased appendix in situ, and is still at risk of complications in the future.
>
> In my note of October 16th, I directed you to consult with another surgeon if you felt compelled to consider antibiotic treatment in cases of acute appendicitis. You did not do so [in] this case, and possibly others. It is inappropriate to not follow directions from a Division Chief, and such deficiencies will have to be considered when reappointments are pending.
>
> Please comply with Division policies in the future.

The SOC likewise disagreed with Dr. Liu's treatment of F.G. On March 6, 2008, the SOC concluded there had been "inappropriate management" and agreed to send a letter to Dr.

Liu "stating that the committee disagrees with her continued management of appendicitis."

   4.   *Dr. Liu Continues Non-Operative Treatment*

Dr. Liu apparently did not change her approach to appendicitis cases. On April 10, Dr. Donahue wrote her another letter reading in part:

> Following two earlier cases, I asked that you desist from your unorthodox treatment of acute appendicitis. I was disappointed to read your note that a patient with acute appendicitis was being treated with antibiotics for invalid reasons. When he failed to improve several days later, his appendix was removed. This patient was placed at unnecessary risk because of your approach, which I categorize as "poor judgment" as well as failure to consult with another surgeon for your unorthodoxy. As the agenda showed in the Division meeting this morning, judgment as well as conformity to Division policies will be considered in the reappointment process.

On May 2, Dr. Liu responded. She said she "agreed to perform appendectomy for all cases of noncomplicated appendicitis" but contended the case had involved complicated appendicitis, for which antibiotic treatment is "accepted management." Three days later, Dr. Madura also wrote to Dr. Liu, informing her that her ongoing mismanagement of appendicitis cases and failure to comply with Dr. Donahue's proposal would be presented to the Hospital Oversight Committee. He wrote that what concerned the Committee

most was Dr. Liu's "insistence that you should not have to be subject to the plan of action outlined by Dr. Donahue because you too are a senior attending."

The conflict soon came to a head. On July 19, a young patient of Dr. Liu's named Sandoval ended up in the surgical intensive care unit with serious complications. The Hospital Oversight Committee reviewed ICU admissions daily for quality assurance purposes. That same day, a member of Quality Assurance contacted Dr. Keen to tell him about Sandoval. Two committees met in special session to address the case: the Hospital Oversight Committee on July 21, and the SOC on July 24. The SOC determined that Sandoval's ruptured appendicitis was apparent in a CT scan, but Dr. Liu did not operate until the next morning. Dr. Madura wrote to Drs. Keen and Donahue on July 24 informing them of the SOC's unanimous conclusion that Dr. Liu's treatment of appendicitis fell below the standard of care and was jeopardizing patients' lives.

Around this same time, Dr. Liu was taking action to combat what she felt was unfair disparagement of her practices. On July 18, she received a memo written by Dr. Donahue months before, which opened: "Previously I have asked that you operate on all cases of suspected acute appendicitis, since that is the way that American surgeons treat adult patients with acute appendicitis." The memo repeated Dr. Donahue's earlier proposal that Dr. Liu consult with a colleague if she felt operative treatment was inappropriate in a particular case of appendicitis. On July 22, Dr. Liu sent a memo defending her performance to Dr. Donahue, copying Dr. Keen and the new interim Medical Director, Dr. Maurice

Lemon. She also met with Dr. Lemon to complain of discrimination on July 25.

5.  *Suspension, Review, and Termination*

Soon after, Dr. Keen took decisive action of his own. On August 4, 2008, he suspended Dr. Liu's surgical privileges and limited her cases to those of "low complexity." He notified Dr. Liu, Dr. Janice Benson, President of the Medical Staff, and Dr. Jay Mayefsky, Chair of the Peer Review Committee. Dr. Liu was on leave at the time. Dr. Keen's letter was re-sent to her late in August.

Two weeks after she was suspended, Dr. Liu met with Drs. Langer and Lemon. They asked her to resign and forgo peer review, but she refused. On August 22, they proposed that in exchange for restoration of her privileges, Dr. Liu agree to a departmental policy regarding acute appendicitis treatment and acknowledge that she could have operated on Sandoval earlier. Dr. Liu agreed, but on August 26, Dr. Langer indicated that Dr. Keen and the SOC wanted "something a bit more all-encompassing than that." He asked her to acknowledge that she could have operated earlier in several other cases. Dr. Liu did not reply. On August 29, Dr. Langer indicated that he could not restore Dr. Liu's privileges.

Stroger Hospital's bylaws require the standing Peer Review Committee to review summary suspensions. Over the next few weeks, members interviewed Drs. Keen, Liu, and others. The Committee also reviewed medical records and reports from the Hospital Oversight Committee and Drs. Liu and Keen, and received correspondence from other physicians. Drs. Keen, Madura, and Donahue did not control the Peer Review Committee and in fact were not on the Commit-

tee at all. Dr. Liu suggests that the proceedings were none-theless unfair because she had insufficient notice of the con-duct she was to rebut and was forced to review cases that were several years old.

Though the timing is unclear, during the review process, another appendicitis case involving Dr. Liu came to Dr. Keen's attention. Sometime in October 2007, Dr. Liu had been an attending physician for a patient named Diane Bucki. Dr. Liu was part of the decision to treat Bucki's ap-pendicitis with antibiotics. Bucki's appendix eventually per-forated, and she received emergency surgery at a different hospital. She sued the County, Dr. Liu, and a former intern for malpractice. The case eventually settled for $190,000, though Dr. Liu was dismissed from the lawsuit before the execution of the settlement. The County told Dr. Keen of the case around the time of the settlement. He added that case to the mix.

On September 25, the Committee issued its unanimous report. As "Complaints," the report listed Dr. Liu's non-operative management of appendicitis despite repeated in-structions to the contrary and her "large number of compli-cations on more complex cases," although the Committee also "felt that she is bright and a competent surgeon." The Committee found:

> 1. The process of oversight in the Department of Surgery is not without the potential for bias, and this may lead a department mem-ber to feel that she/he is the subject of unfair scrutiny. This can cause animosity, and elic-it stubbornness and reluctance to change.

2. That being said, there is sufficient evidence to support the complaints against Dr. Liu. She is not managing appendicitis as per the accepted standard of care at Stroger Hospital, and some of her patients have therefore experienced complications. She has refused to follow the directives of her department and division chiefs. She has exhibited poor judgment in the management of several other types of surgical cases. These have led to [a] number of complications.

3. The Committee is especially concerned with Dr. Liu's lack of insight into her problems.

The Committee recommended that the suspension continue until Dr. Liu completed counseling, "with the goals of gaining insight into her problems, accepting responsibility for her actions, and learning how to change in response to feedback." The Committee recommended restoring her privileges once she completed counseling.

The Executive Medical Staff, or EMS, is composed of about 40 individuals and is responsible for independently reviewing peer review reports. No single person controls the EMS. Pursuant to the bylaws, the EMS met and discussed Dr. Liu's summary suspension three times in October. Though the EMS voted against terminating Dr. Liu on October 14, ultimately, on October 22, all the EMS members present (save one who abstained) voted to keep the suspension in full force and to reduce Dr. Liu's clinical privileges to a limited number of general surgery cases.

At Stroger, every physician must reapply and be reappointed to the staff every two years. In Dr. Liu's case, the Credentials Committee recommended denying reappointment. Drs. Madura and Donahue were recused from the Committee but spoke about Dr. Liu's clinical deficiencies. Dr. Keen was never part of the Committee; he, too, spoke about Dr. Liu. Dr. Mayefsky summarized the Peer Review Committee's findings on the summary suspension. During her own appearance before the Credentials Committee, Dr. Liu defended her conduct by stating that she was "entitled to treat patients in the way she sees best."

The EMS adopted the Credentials Committee's recommendation against reappointment by a vote of eighteen to one, with two abstentions. Dr. Liu appealed both decisions. A three-person committee selected by medical staff president Dr. Benson conducted an evidentiary hearing in the fall of 2009. A successful appeal required the physician to show by clear and convincing evidence that the EMS decision was arbitrary, capricious, or unreasonable—a task presumably made difficult by the fact that the EMS did not keep records of its decision-making process. After nine sessions, including fifteen witnesses and dozens of exhibits, the leader of the committee, Dr. David Levine, drafted unanimous recommendations finding that Dr. Liu had not proven her case and upholding both the summary suspension and the denial of reappointment. Drs. Keen and Madura had no control over the hearing committee. By the time the hearing committee issued its recommendation, Dr. Donahue had passed away. Dr. Liu nevertheless attacks this process as unfair, primarily because the number of cases asserted against her increased throughout.

This was not quite the end of the process Dr. Liu received, though. Pursuant to the bylaws, on January 12, 2010, EMS adopted the hearing committee's recommendations by a vote of eighteen to seven, with three abstentions. The Joint Conference Committee upheld that determination by a vote of six to three in March. The Health System Board of Directors upheld the determination again in April.

Finally, also in January 2010, Dr. Liu was terminated for her behavior during the suspension and reappointment proceedings. She accessed patient records to try to prove that her performance was better than that of her colleagues. Dr. Keen brought disciplinary charges against her. Following a hearing before an independent hearing officer, she was discharged, ostensibly for violating the Health Insurance Portability and Accountability Act, or HIPAA, the Cook County Health and Hospital System Privacy Policy, and Stroger's own HIPAA policy.

B. *Procedural History*

Dr. Liu brought suit alleging race, sex, and national origin discrimination, as well as retaliation and harassment. She asserted a number of other claims as well, but those are not at issue in this appeal. Defendants moved for summary judgment, and the district court granted that motion in its entirety. With respect to the Title VII discrimination and retaliation claims, the court assumed without deciding that Dr. Liu could establish a prima facie case of discrimination. It then identified the defendants' stated non-discriminatory reason for disciplining Dr. Liu—the failure to treat appendicitis with surgery—and held that Dr. Liu had failed to raise a genuine dispute of fact as to whether that reason was a pretext for discrimination based on race, sex, or national origin.

The court also rejected the harassment claims because the letters and reprimands Dr. Liu received were neither objectively offensive nor related to her sex, race, or national origin. Finally, on her retaliation claims, the court held that Dr. Liu had produced insufficient evidence to show causation under the direct method and that she could not prevail under the indirect method due to a lack of evidence of pretext. Dr. Liu appealed with respect to these claims. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II. *Analysis*

We review *de novo* the district court's decision to grant summary judgment. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 876 (7th Cir. 2014). In discrimination and retaliation cases under Title VII, a plaintiff may defeat summary judgment via either the direct or indirect method of proof, *id.* (discrimination); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (retaliation), though it is a mistake to adhere too rigidly to those methods. The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination. See *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015), citing, among other cases, *Bass v. Joliet Public School Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014), and *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) (arguing that "the time has come to collapse all these tests into one"). The substantive standards and methods of proof that apply to Title VII race discrimination and retaliation claims also apply to Dr. Liu's claims under 42 U.S.C. § 1981. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). We follow Dr. Liu's lead in considering her claims for discrimination and retaliation together before turning to her hostile work environment claim.

A. *Discrimination and Retaliation*

The district court analyzed Dr. Liu's national origin and sex discrimination claims under both the direct and indirect methods of proof, her race-based discrimination claims under the indirect method only, and her retaliation claims under the direct and indirect methods. On appeal, Dr. Liu argues only that her claims should have survived summary judgment under the indirect method of proof. Under the indirect method, a plaintiff must establish a prima facie case of discrimination or retaliation, after which the burden shifts to the employer to articulate a non-discriminatory reason for its action. Then, the burden shifts back to the employee to show that reason is pretextual. *Collins v. American Red Cross*, 715 F.3d 994, 999–1000 (7th Cir. 2013) (discrimination); *Harper*, 687 F.3d at 309 (retaliation). Of course, "when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass*, 746 F.3d at 840.

Like the district court and the parties, we focus our analysis on the question of pretext. The burden is on the plaintiff to offer evidence that her employer's stated non-discriminatory reason was a lie intended to mask unlawful discrimination. E.g., *Harden v. Marion County Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015); *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 465 (7th Cir. 2014); *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 601 (7th Cir. 2010). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered" for the adverse action. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).

Even if an employer's decision is mistaken, there is no pretext so long as the decision-maker honestly believed the non-discriminatory reason. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006), quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005); see also *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) ("It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts.") (citations omitted). A plaintiff may show a genuine dispute of fact on pretext by identifying "such weaknesses, implausibilities, inconsistencies, or contradictions" in a stated reason that a reasonable trier of fact could find it "unworthy of credence." *Harper*, 687 F.3d at 311, quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

To justify the actions taken against Dr. Liu, defendants rely on her failure to operate immediately in appendicitis cases. Over several years, Dr. Liu received frequent instructions to operate when patients presented with appendicitis. The undisputed facts show that she repeatedly refused to do so. After several incidents in which patients suffered "complications," a euphemism here for grave dangers to life and health, her privileges were suspended and she was denied reappointment to the hospital staff. These determinations were affirmed no fewer than six times by different medical committees, passing through the Peer Review Committee/Credentials Committee, the EMS, the three-person hearing committee, the EMS a second time, the Joint Conference Committee, and the Health System Board of Directors.

On this record, we cannot agree with Dr. Liu that the defendants' stated non-discriminatory reason for the actions they took was "highly questionable." Dr. Liu points to nothing in the record supporting her argument that defendants "created" a false "trail of alleged wrongdoing." In fact, she continues to defend on the merits her many decisions not to operate on patients with appendicitis. And her complaints about the fairness of the process she received and defendants' tendency to introduce additional evidence do not show that defendants secretly "directed" all the stages of independent review or served as "the prosecutors, the witnesses, and the jury." While Drs. Keen, Madura, and Donahue were certainly involved in presenting the case against her, she has presented no evidence that they controlled these bodies' decision-making.

Dr. Liu argues that defendants were medically off-base in condemning the non-operative approach to appendicitis. She asserts that the use of antibiotics to treat appendicitis has support in the medical literature and that it was appropriate for the patients she treated that way. For purposes of summary judgment, we must allow for the possibility that defendants were unduly narrow-minded on the medical issues. But this would not make their reasoning any less believable, particularly given the complications that some patients like J.E., Diane Bucki, and Sandoval suffered when Dr. Liu delayed operating or chose not to operate at all.

Dr. Liu also points to purported weaknesses in defendants' reasoning, which, as we have said, can permit an inference of pretext. *Harper*, 687 F.3d at 311. She first attacks the punishment imposed upon her as inconsistent with her supposed transgressions. If her failure to perform surgery truly

drove defendants' decisions, she argues, the proper course of action would be to *encourage* surgery by instituting a proctorship or ordering her to operate on appendicitis patients. But the record demonstrates that defendants attempted to do exactly that for months. They directed Dr. Liu to operate on appendicitis patients or to consult with a colleague if she believed operating was inappropriate in a given case. She repeatedly refused to comply. The fact that defendants eventually decided to restrict Dr. Liu's privileges altogether does not, in light of her history, undermine the credibility of defendants' concerns over her repeated refusal to operate on appendicitis patients as directed. The undisputed facts show her history of non-compliance with earlier efforts to encourage her to operate, supported by her statement to the Credentials Committee that she was "entitled" to treat patients as she saw fit.

Dr. Liu also argues that a trier of fact could infer pretext because she was punished for treating appendicitis non-operatively when defendants themselves admit that other general surgeons also use non-operative treatment at least two to three percent of the time without repercussions. But Dr. Liu has presented no evidence that any other surgeon (1) managed appendicitis non-operatively after explicit instructions not to do so; or (2) caused, or appeared to cause, the complications that Dr. Liu's treatments appeared to cause. Put another way, Dr. Liu oversimplifies the conduct for which she was punished. After she refused to comply with repeated instructions to operate on appendicitis patients and her patients experienced several near-tragedies, Stroger terminated her privileges and denied her reappointment. She has pointed to no other surgeon who engaged in a comparable course of conduct.

Next, Dr. Liu argues that the other reprimands she received show pretext because those clashes were not related to her treatment of appendicitis. But Dr. Liu does not explain how these earlier admonitions, even if we presume they were unfair, call into question the legitimacy of defendants' concern about her repeated non-operative treatment of appendicitis. To the extent her theory is that these non-appendicitis reprimands were part of a broad conspiracy to discriminate, the theory is not a reasonable inference on this record. The evidence of unlawful animus is minimal, and defendants' non-discriminatory justification is well-supported. Without supporting evidence, Dr. Liu's attempt to characterize the appendicitis dispute as one more volley in a discriminatory "assault on her professional competence" is only speculation. See *Matthews v. Waukesha County*, 759 F.3d 821, 824 (7th Cir. 2014) (non-moving party is not entitled to the benefit of "inferences that are supported only by speculation or conjecture").

Finally, Dr. Liu argues that the offer of what she calls the "backroom deal," in which she was offered the chance to avoid peer review if she agreed to abide by a departmental policy for treatment of appendicitis and to admit her errors in a number of cases, suggests pretext. In her view, the offer shows that no one truly believed she was a danger to patients because she could have kept her privileges and her appointment if she had "submitted." Again, that inference is not reasonable on this record, which is replete with undisputed evidence that defendants and the SOC believed Dr. Liu's approach was dangerous—to say nothing of the complications that actually occurred in some cases.

The same is true of what Dr. Liu calls the HIPAA "ruse." She says that she was well within her rights to access patient information to prove that her colleagues erred more frequently than she did, and that defendants' HIPAA expert was unaware of any cases in which a physician was terminated for violating HIPAA. But the pretext inquiry turns on honesty, not correctness, and even if we assume a less severe punishment might have been more appropriate, that fact does not, without more, provide evidence of pretext. See *Zayas v. Rockford Memorial Hospital*, 740 F.3d 1154, 1158–59 (7th Cir. 2014) ("Thus, it is irrelevant if Zayas' emails were not egregious enough to justify her termination, as long as Griesman believed they were. … Therefore, we have no trouble finding that Zayas' emails were not a pretextual basis for her termination.").

As a matter of medical science, we must assume for purposes of summary judgment that Dr. Liu might ultimately be correct that her approach to appendicitis treatment will prove to be sound. But as we have said many times, we do not sit as a super-personnel department, examining the wisdom of employers' business decisions. E.g., *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 464 (7th Cir. 2014); *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002); see also *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) (in analyzing pretext, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason") (emphasis in original). By the same token, we certainly do not sit as a super-medical review committee. Nothing in the record before us suggests that defendants' concern with Dr. Liu's repeated refusal to operate

on appendicitis and the repeated dangerous "complications" was false. The district court correctly granted summary judgment for defendants on these claims for race, sex, and national origin discrimination and for retaliation.

B. *Hostile Work Environment*

To survive summary judgment on her claims for hostile work environment, Dr. Liu must have presented sufficient evidence to present a material issue of fact on four elements: (1) her work environment must have been subjectively and objectively offensive; (2) her race, sex, and/or national origin must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability, meaning either that a supervisor participated in the harassment or that Stroger Hospital was negligent in discovering or remedying co-worker harassment. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).

Dr. Liu contends that the reprimands she received, including those unrelated to her treatment of appendicitis, constituted harassment sufficiently offensive, pervasive, and severe to overcome summary judgment. We need not decide this question, however, because no evidence permits a reasonable inference that those reprimands were related to Dr. Liu's membership in any protected class. Dr. Liu proffers only Dr. Donahue's statements to prove a connection: (1) he called her a "good girl" in the year 2000; (2) he once asked Dr. Liu why she needed a raise when her husband worked; (3) he asked a different female doctor, outside of Dr. Liu's presence, why all female doctors have to be "bitches"; and (4) he sent the May 2, 2008 memo stating that "American surgeons" treat appendicitis with surgery. Dr. Liu has of-

fered no evidence that the first three remarks, none of which came from Drs. Keen or Madura, are connected in any way to the memoranda and reprimands she received much later. Dr. Donahue's "American doctors" remark did appear in one of the letters that Dr. Liu condemns as harassment, but that single ambiguous remark, bolstered by nothing more than Dr. Liu's own speculation, cannot support her theory that national-origin bias motivated the defendants' behavior in communicating their disagreement with the quality of care she provided to patients.

The judgment of the district court is AFFIRMED.