In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 15-2132

CELESTE DAVID,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF COMMUNITY
COLLEGE DISTRICT NO. 508, doing
business as CITY COLLEGES OF
CHICAGO,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-02508 — **Harry D. Leinenweber**, *Judge.*

———————————

ARGUED JANUARY 14, 2016 — DECIDED JANUARY 13, 2017

———————————

Before FLAUM and RIPPLE, *Circuit Judges*, and PETERSON, *District Judge.**

———————————

* Of the Western District of Wisconsin, sitting by designation.

RIPPLE, *Circuit Judge*. Celeste David, an African-American woman over the age of forty, was an employee of the City Colleges of Chicago ("CCC") from 1980 until 2012. She announced in August 2011 that she planned to retire in June of the following year. After her announcement, she requested a change in title and an increase in salary because she was performing additional responsibilities related to the implementation of a software system; she was not awarded either. Following her retirement, her job duties were performed by Christopher Reyes, an Asian man under the age of forty, who was paid substantially more than Ms. David.

Ms. David subsequently brought this action alleging that she was denied a pay increase on the basis of her race, sex, and age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and the Equal Pay Act, 29 U.S.C. § 206(d). The district court granted summary judgment to CCC. Because we believe that the record, assessed in its entirety, does not contain sufficient evidence to permit a verdict for Ms. David on any of the counts, we now affirm the judgment of the district court.

# I

# BACKGROUND

## A.

Ms. David began working for CCC in October 1980. She held different positions throughout her career, but her final position at CCC was Manager of End-User Services in CCC's Office of Information Technology ("OIT"). In that position, Ms. David worked in computer support: she oversaw staff at

the help desk and compiled internal reports of student data and external reports of staffing, building, and salary data required by the Illinois Community College Board and the Illinois Board of Higher Education. According to the job description for the Manager of End-User Services position, the qualifications include a "Bachelor's Degree in Computer Science, Information Science, Computer Information Systems, Data Processing, or an appropriate related field."[1] The job description also provides, however, that "[a] combination of educational and work experience may be taken into consideration at the discretion of the administration."[2] Ms. David's salary at the time of her retirement in 2012 was $75,594.67.

In 2001, "CCC implemented a new web application[,] PeopleSoft[,] for the collection and retention of [CCC's] educational, personnel, and financial data."[3] PeopleSoft has several "pillars" directed toward different aspects of school administration: student administration, human resources, and financials.[4] When CCC began implementing the PeopleSoft application, Ms. David "was assigned to handle the security function of the application," which "included: acting upon requests to give or remove a CCC employee or student's access to various levels of the PeopleSoft pillars and creating reports detailing which individuals had what levels of access to the

---

[1] R.18-26 at 2.

[2] *Id.* at 3.

[3] R.28 ¶ 19.

[4] R.29-12 (Reyes Dep.) at 10.

system."[5] From the time PeopleSoft was implemented in 2001 until October 11, 2011, CCC contracted with a company called Sync Solutions "to provide staff augmentation services to the OIT."[6] During this time, a Sync Solutions IT consultant, Christopher Reyes, assisted Ms. David with her PeopleSoft security duties.

In 2011, due to the expiration of the contract with Sync Solutions, OIT made an effort to hire internally former Sync Solutions consultants to support PeopleSoft and other key applications. One of those individuals was Reyes.[7] In October 2011, Reyes applied for, and received, the position of "Functional Applications Analyst," which required a Bachelor's Degree in a relevant field.[8] In that position, he "was responsible for configuring the PeopleSoft Student Administration pillar" and reported directly to Valerie Davis, District Director of PeopleSoft Student Systems.[9] Initially, Reyes continued to assist Ms. David with her PeopleSoft security duties, specifically generating required reports. Once he had taught Ms. David his methods for performing these tasks, she began performing

---

[5] R.28 ¶ 25.

[6] *Id.* ¶ 21.

[7] Reyes previously had been employed at CCC as a student intern and, in 1999, was promoted to the position of Customer Services Coordinator. He was hired by Sync Solutions in June 2001 and earned a salary of approximately $60,000.

[8] Reyes has a Bachelor of Science degree in Computer Information Systems.

[9] R.28 ¶ 57.

these functions on her own, and Reyes focused exclusively on the PeopleSoft student administration application.

On August 1, 2011, prior to CCC's hiring Reyes, Ms. David had announced her intention to retire on June 30, 2012. Approximately one month later, Ms. David met with Craig Lynch, the Vice Chancellor for OIT, who had the authority to make promotion recommendations to the Chancellor.[10] Ms. David asked Lynch for a new job title and more pay because she was performing additional tasks related to PeopleSoft security. Lynch told Ms. David to complete a Job Analysis Questionnaire ("JAQ"), a form that CCC employees can fill out to request more pay or a different title. Lynch also said that he would look into her job description and pay level. At some point during the meeting, Lynch inquired of Ms. David, "aren't you about to retire[?]"[11]

Lynch reviewed Ms. David's job description and acknowledged that it did not include a description of Ms. David's PeopleSoft security duties. However, he concluded that, even if some change should be made in job description or job title, it was a lateral move that did not require additional compensation because the additional duties were "transactional in nature and did not involve analysis, critical thinking [or] problem solving."[12] Lynch did send an email to CCC's Executive Director of Compensation and Staffing, Jane Barnes,[13] which

---

[10] Lynch is both African-American and over forty.

[11] R.29 ¶ 4 (internal quotation marks omitted).

[12] R.28 ¶ 33.

[13] Barnes also is African-American and over forty.

stated: "Celeste David is working in a position that is not in alignment with her description. … Does it make sense to retitle her (not sure if she would need additional compensation)? Let me know. I need to update her on what the possibilities are."[14]

In her deposition, Barnes testified that she does not recall specifically responding to Lynch, but believes that she spoke to him. It is undisputed, however, that she would have been disinclined to seek a raise for Ms. David because giving her a raise over a certain amount would have resulted in a fine by the State University Retirement System ("SURS").[15] Moreover, Barnes did not believe that Ms. David's position should be retitled or that she should receive a raise "because the creation and approval of a new position and salary would take several months, and [Ms. David] was retiring in June 2012."[16]

As Lynch had instructed, Ms. David filled out a JAQ. The questionnaire never was processed, and Ms. David remained at her same pay level, $75,594.67, and in her position of Manager of End-User Services, until her retirement.

In February 2012, Ms. David filed an internal Equal Employment Opportunity Complaint. On that form, Ms. David claims that she met with Lynch on three different occasions to discuss her pay and title. On each occasion, according to Ms. David, Lynch referenced her impending retirement. CCC's internal EEO office confirmed receipt of Ms. David's

---

[14] *Id.* ¶ 34.

[15] *See id*. ¶ 36.

[16] *Id.* ¶ 37.

complaint form on February 3, 2012, but was unable to resolve the complaint before Ms. David retired in June.

When Ms. David retired at the end of June 2012, the PeopleSoft security functions reverted back to Reyes. He did not receive any increase in pay for taking on these additional duties. However, after Reyes's position was claimed by the union, he received a mandatory pay increase to $85,280 pursuant to the collective bargaining agreement.

Six months after Ms. David retired, Reyes applied for the newly created,[17] non-union position of Senior Systems Security Analyst.[18] During his interview, he told the committee that he would like to retain his job duties as a Functional Applications Analyst as well.[19] Reyes was hired into the position of Senior Systems Security Analyst on December 10, 2012, with an annual salary of $93,808.[20] "At that time, it was

---

[17] The job description reflects that the position was "[a]pproved by [c]lassification & [c]ompensation" on June 1, 2012. R.18-20 at 2.

[18] Ms. David disputes that this is actually a new position. She claims it is her old position, retitled and with greater qualification requirements.

[19] His duties and responsibilities in the Functional Application Analyst position included: "[t]est[ing] all PeopleSoft customizations, enhancements, interfaces and reports"; "[w]rit[ing] documentation of system designs, functional specifications and test results"; "[p]erform[ing] unit and system tests and functional regression testing of developed code"; and "[d]esign[ing], document[ing] and test[ing] interfaces and transactions with other systems using application programming interfaces." R.18-18 at 1.

[20] *See* R.28. ¶ 64.

[CCC's] practice to grant a 10% pay increase to CCC employees who were internally promoted into positions designated in Salary Schedule N (non-Union)."[21]

In April 2013, CCC hired Rosane Rodriguez, a Hispanic female over forty, to the position of Technical Applications Developer with an annual salary of $85,000. Rodriguez has a Bachelor of Science degree in Computer Information Services, which is a requirement of the position. She was hired into that position to develop an "interaction hub portal"[22] and also to assist Reyes with the PeopleSoft security duties.

## B.

Ms. David filed a four-count complaint alleging that she had been discriminated against on the basis of her age, gender, and race, in violation of the ADEA, Title VII, and the Equal Pay Act.[23] CCC moved for summary judgment on all counts. Ms. David claimed that Lynch's comments about her impending retirement, his failure to process her JAQ, and CCC's slow response to her EEO complaint demonstrated both age discrimination and pretext. She further maintained that Reyes and Rodriguez performed equivalent work but were compensated at a much higher level. The disparities, she maintained, evidenced gender, race, and age discrimination.

---

[21] *Id.*

[22] R.29-12 (Reyes Dep.) at 9.

[23] The district court's jurisdiction was premised on 28 U.S.C. § 1331.

Finally, she contended that Lynch's and Barnes's explanations for failing to accord her a new title or higher pay were unworthy of credence.

The district court ruled in favor of CCC.[24] It turned first to isolating the adverse employment actions of which she complained. It first noted that Ms. David had to establish that she suffered an adverse employment action on the basis of her gender, race, or age, and observed that the only materially adverse actions that Ms. David alleged were unequal pay and failure to reclassify her position. Although Ms. David had argued that Lynch's and Barnes's failure to properly process her JAQ and CCC's failure to attend promptly to her EEO complaint were materially adverse actions, the court disagreed. It observed that neither action affected "the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits."[25] "Instead those failures [we]re, at most, the vehi-

---

[24] The district court employed, throughout its opinion, the lexicon and methodology common at the time it ruled. As we discuss at some length later in the opinion, *see infra* at 12–13, the terms "direct" and "indirect" evidence no longer retain the significance they were once thought to have in the analysis of discrimination cases. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

[25] R.40 at 6 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), *overruled on other grounds by Ortiz*, 834 F.3d at 765).

cles by which CCC *did* engage in materially adverse employment actions—that is, CCC's denial of David's request for a better job title and more pay."[26]

The court then concluded that Ms. David had not come forward with a similarly situated employee who was treated more favorably than she was treated. The court noted that, in order to be similarly situated, the employee had to be similar "in all *material* respects."[27] Ms. David's proposed comparators, however, did not meet this requirement. With respect to Reyes, the court explained that, when CCC hired Reyes from Sync Solutions as a full-time Functional Applications Analyst, he had a Bachelor of Science degree in Computer Information Systems, a qualification that Ms. David did not have. Moreover, in his position, Reyes performed "totally different" duties than what he performed while working for CCC as a Sync Solutions consultant;[28] specifically, he worked on PeopleSoft Administration—a pillar on which Ms. David never worked. Later Reyes applied for, and was given, the position of Senior Systems Security Analyst. In sum, the district court rejected Ms. David's claim that Reyes simply was doing her old job, but with higher pay than she received. The district court noted that the new position filled by Reyes required a Bachelor of Arts or Science degree in Computer Science, with seven years of related experience in systems analysis, design, soft-

---

[26] *Id.* at 6–7 (emphasis in original).

[27] *Id.* at 12 (emphasis in original) (quoting *Warren v. Solo Cup Co.*, 516 F.3d 627, 630–31 (7th Cir. 2008)).

[28] *Id.* at 14 (internal quotation marks omitted).

ware support and application of security controls. Ms. David's job description, however, did not require a bachelor's degree, or the same kind of software experience.

Ms. David fared no better in comparing herself to Rodriguez. The district court noted that Rodriguez's position, like Reyes's, required a college degree. Additionally, Rodriguez's position centered on the development of "the interaction hub,"[29] which admittedly was not part of Ms. David's responsibilities. The district court therefore concluded that neither employee was sufficiently similar to Ms. David to serve as a comparator.

With respect to her age claim, the district court also concluded that Lynch's remarks concerning Ms. David's impending retirement, without more, did not establish that Lynch was motivated by Ms. David's age in denying her a new title or more pay.

Turning to Ms. David's Equal Pay Act claim, the court noted that, in order to establish a prima facie case, the plaintiff first "must show that different wages are paid to employees of the opposite sex. Second, plaintiff must show that she did equal work which requires equal skill, effort and responsibility. Third, plaintiff must show that the employees have similar working conditions."[30] If Ms. David were to establish this, the court continued, the burden would then shift to CCC to show that the pay disparity was due to "(1) a seniority system, (2) a merit system, (3) a system which measures earnings by

---

[29] *Id.* at 16 (internal quotation marks omitted).

[30] *Id.* at 18–19 (internal quotation marks omitted).

quantity or quality of production or (4) any other factor other than sex."[31] The district court concluded that, even if Ms. David had established a prima facie case under the Equal Pay Act, "that claim must fail based on the facts that doom [Ms.] David's Title VII and ADEA claims," namely that the disparity in pay is attributable to Reyes's college degree.[32]

Ms. David timely appealed.[33]

## II

## DISCUSSION

### A.

"We review de novo a district court's grant of summary judgment. Summary judgment is appropriate when, after construing the record in the light most favorable to the non-moving party, we conclude that no reasonable jury could rule in favor of the nonmoving party." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

After the district court had issued its decision in this case and after the case was briefed on appeal, we decided *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). *Ortiz* explicitly instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. Instead, the test "is

---

[31] *Id.* at 19 (internal quotation marks omitted).

[32] *Id.* at 19–20.

[33] Our jurisdiction is premised on 28 U.S.C. § 1291.

simply whether the evidence would permit a reasonable fact-finder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id. Ortiz*, however, did not alter "[t]he burden-shifting framework created by *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *Id.* at 766 (parallel citations omitted). As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases. *See, e.g.*, *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (observing that a "prima facie case in Title VII litigation … refers to a *common, but not exclusive*, method of establishing a triable issue of intentional discrimination" (emphasis added) (internal quotation marks omitted)); *Morgan v. SVT, LCC*, 724 F.3d 990, 997 (7th Cir. 2013) (explaining that "the original purpose of *McDonnell Douglas* … was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach a trier of fact").[34] As *Ortiz* and our other case law make clear, however, *McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination? *Morgan*, 724 F.3d at 997 ("The central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.).").

---

[34] *See also Pearson v. Ill. Bell Tel. Co.*, No. 15 C 653, 2016 WL 7374235, at *6 (N.D. Ill. Dec. 20, 2016) ("*McDonnell Douglas* identifies one pattern that the evidence might fit that would enable a reasonable juror to find discrimination … .").

Because the *McDonnell Douglas* framework survived *Ortiz*, and because Ms. David has presented her argument in those terms, we will begin our assessment of the evidence by employing that construct and addressing first whether Ms. David has established a prima facie case of discrimination. We will then, however, assess cumulatively all the evidence presented by Ms. David to determine whether it permits a reasonable factfinder to determine that her smaller salary was attributable to her age, race, or sex.

### B.  Title VII and ADEA Disparate Pay Claims

Ms. David's Title VII and ADEA claims are essentially disparate pay claims: she claims that employees who were younger, non-African-American, or male were paid more than she was paid for equivalent work, or, at the very least, were compensated for taking on additional work when she had not been compensated.[35]

---

[35] Ms. David also claims that CCC's failure to process her JAQ and its delay in investigating her EEO (pay) complaint constituted actionable adverse employment actions. Title VII protects an employee from discriminatory actions with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). "To be actionable," therefore, "there must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. In other words, the adverse action must materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) (citation omitted) (internal quotation marks omitted). Neither the failure to process the JAQ nor the failure to complete the EEO investigation affected the terms and conditions of Ms. David's employment. In-

**1.**

Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 765. "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* Although previously we have noted that "[i]t is somewhat unclear what standard guides the

stead, as the district court noted, the questionnaire and the complaint process simply were means to an end: they were the methods by which Ms. David was attempting to secure a new title and a raise. It was the failure to receive a new title and the raise that is at the heart of her complaint.

Ms. David relies on *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), for the proposition that "[a]n employment action is materially adverse[] if it would deter a reasonable worker from complaining of discrimination," Appellant's Br. 14, and further argues that CCC's failure to process the JAQ or the EEO complaint would have this effect. The standard that Ms. David invokes, however, relates to Title VII's *antiretaliation* protection, which incorporates a broader definition of materiality than Title VII's protection against discrimination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 64 (observing that the "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). Ms. David's claims, however, do not include retaliation, only discrimination.

determination of a *prima facie* case of disparate pay under Title VII," *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 433 (7th Cir. 2005) (emphasis in original), in a more recent case, we have applied the standard *McDonnell Douglas* framework for evaluating disparate pay claims under Title VII and the ADEA, *see Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008). Consequently, that will provide the basis for analyzing Ms. David's pay claims under Title VII and the ADEA.

There is no question that Ms. David is a member of a protected class, that she was performing her job in an acceptable manner, and that she was being paid less than Reyes and Rodriguez. We must focus therefore on whether Reyes and Rodriguez were similarly situated to Ms. David. We have observed that whether employees are similarly situated is a "flexible, common-sense, and factual" inquiry. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Relevant factors include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Warren*, 516 F.3d at 631 (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)).

Turning first to Reyes, Ms. David claims that the position that Reyes ultimately was hired into, the Senior Systems Security Analyst position, essentially was her old job. She relies on statements by her supervisor, Robin Jackson, and by Reyes that CCC was looking to fill Ms. David's "old position."[36] Regardless of how the position is referenced in conversation,

---

[36] *See* Appellant's Br. 16–17.

however, Ms. David must establish that she and Reyes were "directly comparable … in all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (internal quotation marks omitted).

Looking first to the job descriptions, it is clear that Ms. David's position—"Manager, End-User Services,"—bears little resemblance to Reyes's position—"Senior Systems Security Analyst."[37] Ms. David's position was focused on developing policies and supervising staff related to the delivery of services. It required a Bachelor's Degree in Computer Science or a related field, but also allowed for "[a] combination of educational and work experience [to] be taken into consideration at the discretion of the administration."[38] It required technical expertise in DOS and Windows, previous experience installing and/or administering other operating programs, and proficiency in basic software applications.[39] The Senior Systems Security Analyst, by contrast, was responsible for "[d]efin[ing], configur[ing], and administer[ing]" the PeopleSoft system; "[e]nsur[ing]" the security of the systems; and "[e]valuat[ing], test[ing], monitor[ing], and maintain[ing] Oracle security configurations and security administration policies."[40] In short, the focus of the Senior Systems Security An-

---

[37] *Compare* R.18-26 (Manager, End-User Services Job Description), *with* R.18-20 (Senior Systems Security Analyst Job Description).

[38] R.18-26 at 2–3.

[39] *See id.* at 3.

[40] R.18-20 at 1.

alyst position was the development, implementation, and ser-
vicing of the computer systems themselves. The position re-
quired a Bachelor's Degree in Computer Science, seven years
of experience in "systems analysis, design, software support
and application of security controls," and "[e]xperience work-
ing with PeopleSoft applications."[41]

Ms. David does not maintain that she had the qualifica-
tions or the skills to perform the Senior Systems Security An-
alyst position. Instead, she maintains that "Reyes … testified,
that as a Senior Security Analyst, he performs the exact same
duties that David performed before she retired."[42] Reyes's
deposition testimony, however, does not support this asser-
tion. Reyes testified that, when he was hired into the Senior
Systems Security Analyst position, he was "perform[ing] the
same job duties that [Ms. David] had previously performed"
*along with* the duties of "the functional application analyst po-
sition that I had before *in addition to* the senior security ana-
lyst."[43] In short, when he was hired into the Senior Systems
Security Analyst position, he was performing Ms. David's old
job duties, the job duties from his own prior position (Func-
tional Application Analyst), and the new responsibilities of
the Senior Systems Security Analyst position. There simply is
no evidence in the record that Reyes, in his position of Senior
Systems Security Analyst, was performing only duties equiv-
alent to that which Ms. David had performed.

---

[41] *Id.* at 2.

[42] Appellant's Br. 17 (quoting R.29 ¶ 37).

[43] R.29-12 (Reyes Dep.) at 8 (emphasis added).

   Ms. David also maintains that she was similarly situated to Rodriguez because Rodriguez "also performed PeopleSoft security duties."[44] The fact that one of Ms. David's job duties eventually found its way to Rodriguez, who was hired over one year after Ms. David retired, does not establish that they were similarly situated for purposes of pay. Again, even a cursory comparison of Ms. David's job duties with those of a Technical Applications Developer—the position held by Rodriguez—establishes that Rodriguez's job was focused on software installation, testing, documentation, and maintenance.[45] Ms. David does not maintain that she had the qualifications—a Bachelor's Degree in Computer Science—or skills to perform these functions.

   The core duties of Reyes's and Rodriguez's positions focused on the development, installation, and monitoring of software programs that Ms. David did not, and could not, perform. Neither person is similarly situated to Ms. David for purposes of her disparate pay claim, and she has failed to establish a prima facie case of discrimination under Title VII.[46]

---

[44] Appellant's Br. 12.

[45] *See* R.18-13 (Technical Applications Developer Job Description).

[46] Ms. David also makes a slightly different argument. She claims that she was treated differently on the basis of her age, race, and sex because when younger, non-African-American, male employees were assigned additional duties, they were provided assistance or greater pay, but she was not provided either when she assumed responsibilities related to PeopleSoft security. The record simply does not bear this out. Ms. David began performing the PeopleSoft security responsibilities on her own in November 2011 and did not receive any assistance or extra pay for those responsibilities prior to her retirement in June 2012. In June 2012, after

**2.**

In assessing cumulatively all the record evidence without the assistance of the *McDonnnell Douglas* paradigm, it is clear that a reasonable jury could not conclude that any pay disparity was the result of Ms. David's age, race, or sex.

In addition to the evidence concerning the responsibilities and pay of Reyes and Rodriguez, Ms. David believes several other pieces of evidence point to an illicit motive: (1) CCC's failure to process her JAQ and complete its EEO investigation prior to her retirement; (2) Lynch's reference to Ms. David's retirement when she inquired about a change in title and raise; and (3) Lynch's and Barnes's lack of credible reasons for not retitling her position or awarding her a raise.

Neither Lynch, the head of the OIT department, nor Barnes, recalled receiving a JAQ from Ms. David. In light of Ms. David's request for a new title and increase in pay, however, Lynch did review her job description and concluded that it did not reflect the PeopleSoft security duties that she had been performing.[47] In November 2011, Lynch sent an email to Barnes noting that Ms. David's PeopleSoft security

---

Ms. David retired, Reyes took back those responsibilities, but "no one assisted him" until Rodriguez was hired in April 2013. R.29-11 (Jackson Dep.) at 24. Reyes, therefore, performed the PeopleSoft security responsibilities without assistance for even longer than Ms. David did. Moreover, Ms. David does not dispute that "Reyes did not receive any increase in pay for taking on these additional duties"; rather, she admits that his subsequent pay increase was due to the union claiming his position. R.28 ¶¶ 60–61.

[47] R.28 ¶ 33.

duties were "not in alignment with her description" and inquiring if CCC should "retitle her" and "if she would need additional compensation."[48] Barnes, who was the person to whom Ms. David's JAQ would have been directed, "did not believe that CCC should retitle Plaintiff into a new position because the creation and approval of a new position and salary would take several months, and Plaintiff was retiring in June 2012."[49] Additionally, Barnes was concerned that CCC would incur a penalty by SURS if it increased Ms. David's pay more than six percent in the year prior to her retirement.[50]

---

[48] *Id*. ¶ 34 (internal quotation marks omitted).

[49] *Id.* ¶ 37.

[50] *See id*. ¶ 36. Ms. David argues that this rationale is unworthy of credence because, among other reasons, the statute on which CCC "rests this position … makes no mention of a 'fine' or penalty." Appellant's Br. 27. This is a nonstarter. Section 5/7-172(k) of Chapter 40 of the Illinois Compiled Statutes provides that,

> [i]f the amount of a participating employee's reported earnings for any of the 12-month periods used to determine the final rate of earnings exceeds the employee's 12 month reported earnings with the same employer for the previous year by the greater of 6% or 1.5 times the annual increase in the Consumer Price Index[], … the participating … instrumentality … shall pay to the Fund, in addition to any other contributions required under this Article, the present value of the increase in the pension resulting from the portion of the increase in salary that is in excess of the greater of 6% or 1.5 times the annual increase in the Consumer Price Index[] … .

Thus, Illinois law clearly imposes an additional monetary burden on an employer who raises the salary of an employee during his or her last

Thus, despite CCC's failure to process the JAQ, Ms. David nevertheless received a review of her request.

Ms. David notes that it would not have been *impossible* to complete the review, retitle her position, and give her a raise before retirement. She notes that, because the Senior Security Systems Analyst position was approved at approximately the time that she retired, her position also could have been evaluated and upgraded before her retirement.

The timing of the approval of the Senior Security Systems Analyst position, however, confirms rather than undermines Barnes's rationale. It took the CCC ten months, from the time of Ms. David's announcement of her retirement in August 2011 until June 2012, to assess its OIT needs and approve the Senior Security Analyst position.[51] Ms. David has not presented any evidence that the review of her position could have been accomplished in a shorter period of time.

More importantly, however, there simply is no reason to believe that Lynch, who was responsible for making recommendations,[52] believed that Ms. David's performance of PeopleSoft security functions warranted a promotion or a pay increase. Indeed, Ms. David admitted that Lynch believed that she was not entitled to a pay increase and that, if her job title

---

year of employment in excess of six percent or one-and-one-half times the increase in the Consumer Price Index.

[51] It was another six months before the position actually was filled by Reyes.

[52] R.29-2 (Lynch Dep.) at 5.

was re-written, it "would be a lateral move, with no change in pay."[53]

Ms. David now claims that Lynch should not be believed because he was not her immediate supervisor and, therefore, would not have known whether her job functions warranted a pay increase. It is undisputed, however, that Lynch was responsible for the OIT department and had the authority to make promotion recommendations. Ms. David's argument, at bottom, is simply that Lynch did not have sufficient first-hand knowledge to make an informed promotion recommendation. This is an attack on the wisdom of Lynch's decision—or, more accurately, on the wisdom of CCC's decision to bestow on Lynch the responsibility for making promotion recommendations—not on the honesty of Lynch's explanation. Our role, however, is not to inquire into the wisdom of an employment decision, but simply to determine if "the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Ms. David has not come forward with any evidence that this is the case.

Finally, Ms. David notes that Lynch, during at least one of the meetings concerning her desired promotion and increase in pay, mentioned her impending retirement. Ms. David would like us to construe those comments as age-related. The Supreme Court rejected such an approach in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). In that case, the employer had terminated the employment of a sixty-two-year-old man to prevent his pension plan from vesting. The Court observed

---

[53] R.28 ¶ 33.

that pension plans typically vest "once the employee completes a certain number of years of service with the employer. … Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.*

Similarly, eligibility for retirement may be based on age, years of service, or a combination of the two. Ms. David has not identified any record evidence that explains how retirement eligibility is determined at CCC. We therefore cannot equate retirement eligibility with age.

Moreover, Ms. David was not simply eligible for retirement when she had her initial meeting with Lynch about upgrading her position and pay; she had announced her intention to retire several months earlier. Thus, when Lynch referenced her impending retirement, he was not making any assumptions about retirement eligibility based on Ms. David's age; he merely was referencing her current employment status as a "short timer."

Indeed, all of the evidence of "discrimination" points to this conclusion. Ms. David had made clear that, as of June 2012, she no longer would be an employee of CCC. Having made that announcement, CCC had little motivation to expend time and resources retitling or reclassifying her position. That may not have been an enlightened decision. But there simply is nothing in the record to support an inference that the decisions were based on Ms. David's age, sex, or race, rather than her announcement of her voluntary retirement.

Because the evidence does not permit a reasonable factfinder to conclude that Ms. David's age, sex, or race was the

cause of her lower pay, *see Ortiz*, 834 F.3d at 765, the district court properly granted summary judgment to CCC on Ms. David's Title VII and ADEA claims.


## C.  Equal Pay Act Claim

"The Equal Pay Act forbids employers from paying different rates to men and women for the same work at the same establishment." *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) (internal quotation marks omitted). In order to establish a prima facie case under the Equal Pay Act, a plaintiff must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006) (internal quotation marks omitted). In determining whether two jobs are equal, "we look to whether the jobs have a 'common core of tasks, i.e., whether a significant portion of the two jobs is identical.' Once a plaintiff establishes a 'common core' of tasks, we ask whether any additional tasks make the jobs 'substantially different.'" *Id.* (citation omitted) (quoting *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003)). In making this determination, the court "look[s] to the actual job duties performed by each employee, not to his or her job description or title." *Id.*

Ms. David maintains that Reyes was paid a higher salary for, essentially, performing her old job functions. According to Ms. David, "Reyes testified that his posit[i]on as Senior Se-

curity Analyst was the exact same job as David before she retired."[54] This does not reflect accurately Reyes's testimony. Reyes testified that, in the Senior Systems Security Analyst position, he performed Ms. David's PeopleSoft security responsibilities, along "*with* the functional application analyst position that I had before *in addition to* the senior security analyst."[55] He also testified that the duties listed in the Functional Analyst and Senior Systems Security Analyst Job descriptions "accurately reflect the duties" that he performed in those positions.[56] As explained in some detail above, those duties involve the development, implementation, and servicing of the computer systems.[57] The record reveals that Ms. David did not perform similar duties in her position or that she had the skills to perform these functions. Reyes's position, therefore, included responsibilities that were "substantially different" from those performed by Ms. David and that Ms. David could not perform. She therefore has not established a prima facie case under the Equal Pay Act.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

---

[54] Appellant's Br. 31.

[55] R.29-12 (Reyes Dep.) at 8 (emphasis added).

[56] *Id.* at 13–14.

[57] *See supra* note 19 and at 17–18.