In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-1958

OTIS B. GRANT,

*Plaintiff-Appellant,*

*v.*

THE TRUSTEES OF INDIANA UNIVERSITY, ET AL.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00826-TWP-DML — **Tanya Walton Pratt**, *Judge.*

_____

ARGUED SEPTEMBER 29, 2016 — DECIDED AUGUST 31, 2017

_____

Before WOOD, *Chief Judge*, and RIPPLE and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. The University of Indiana South Bend dismissed tenured Professor Otis Grant in 2011 for "serious misconduct" based on misrepresentations in his curriculum vitae. Grant sued the University, Trustees, and several University employees, filing twenty-six claims arising out of

his termination. The district court partially granted the defendants' motion for judgment on the pleadings and later granted the defendants' motion for summary judgment on the remaining claims.

On appeal, Grant contends that the district court inappropriately granted summary judgment on five claims. Grant, who is African American, maintains that the University: (1) discriminated against him on the basis of race; (2) retaliated against him for his complaints against two University officials; (3) denied him due process of law; (4) defamed him in the *South Bend Tribune*; and (5) breached a contract created by the University's handbook. In viewing the evidence in the light most favorable to Grant, we find that Grant has failed to produce admissible evidence demonstrating there exists any disputed issue of fact as to these five claims. So we affirm the district court's judgment in the defendants' favor.

## I. BACKGROUND

Otis Grant was a professor at the University of Indiana South Bend ("IUSB") from 1999 until his dismissal in 2011. During that time, he was granted tenure in the College of Arts and Sciences and won several awards. But in 2008, several students complained to University administration that Grant inappropriately cancelled classes, used obscene language in class, dismissed two students from his course without following proper procedure, and had permitted a non-employee to grade student work and access academic records.

Executive Vice Chancellor of Academic Affairs, Alfred J. Guillaume, Jr., assigned Dean Lynn R. Williams to investigate the complaints. As a result of his investigation, Williams recommended that Grant be denied access to the College of Arts

and Sciences travel funds for the fiscal year and a salary increase for 2009-10. Williams also accused Grant of being evasive and refusing to provide information or providing false information during the investigation. Guillaume accepted and implemented the recommended sanctions. Grant then filed an affirmative action complaint with the University's Director of Affirmative Action, alleging Williams took an adverse employment action against Grant because of his race.

Meanwhile, the students had also reported their concerns to the local newspaper, the *South Bend Tribune*. The newspaper submitted several open records requests to the University, including two relating to Grant's education and training. Guillaume began collecting records for a response, as the University is subject to Indiana's Access to Public Records Act. In doing so, Guillaume noticed discrepancies in Grant's employment records and attempted to obtain clarification. But Guillaume's exchange with both Grant and the institutions listed on Grant's application materials only raised more concerns. For example, over the course of his employment at IUSB, Grant had changed the name of the judge for whom he clerked from "Richard M. Wright" to "Richard M. Rittenband" and changed the name of the institution from which he received a master's degree from the "Gestalt Institute of Psychology" to the "Gestalt Institute in Liverpool."

## A. Faculty Misconduct Review Committee

Guillaume determined that Grant "misled the university when he applied for a faculty position by falsifying his academic credentials in numerous and significant ways" and repeated such misrepresentations throughout his employment. Guillaume presented his findings to the Faculty Misconduct

Review Committee ("FMRC") on September 8, 2009, and recommended that Grant be dismissed for serious personal misconduct. Grant was notified and he responded on October 6, 2009.

On November 4, 2009, the FMRC issued a written recommendation in which it declined to proceed with a formal hearing, though it noted that the issues were "troubling." The FMRC reasoned that verification of Grant's credentials had been the responsibility of the Search and Screen Committee at the time Grant was hired, and it thought that a hearing was not likely to establish "chronic or substantial incompetence or misconduct" as the charges did not relate to Grant's scholarship or teaching. The FMRC also concluded that, even if the allegations against Grant were true, they could not be the basis for dismissal and removal of Grant's tenure. Six months later, on May 10, 2010, Guillaume submitted a recommendation for Grant's dismissal to IUSB Chancellor Uma Mae Reck based on his strong belief that the FMRC had reached the wrong decision. After that, Guillaume had no further involvement in any employment decisions concerning Grant.

## B. Investigation and Termination

Reck met with Grant to discuss Guillaume's recommendation for dismissal on September 1, 2010. Grant denied all charges and alleged Guillaume was retaliating against him for filing the affirmative action complaint against Williams. Because of Grant's allegations of discrimination and the contradictory assertions by Guillaume and Grant regarding Grant's credentials, the University, through its counsel, hired an independent investigation firm, Klink & Company ("Klink"). Reck informed Grant in writing that Klink had been retained to conduct its own review of Grant's curriculum vitae ("CV")

and application materials. Meanwhile, Grant provided a 42-page response to Reck regarding Guillaume's recommendation for dismissal. However, he did not include any new documentation to substantiate his credentials.

Reck received Klink's final report on February 22, 2011. Klink noted that Grant had impeded its investigation by failing to provide consent to verify his employment and educational credentials. Klink concluded that many of Grant's credentials were "vague," "misleading," or "otherwise incorrect." For example, in his 1998 CV, Grant represented that he was a lecturer or instructor at California State College, Howard University, the Armed Forces Institute, and Boston State College. Grant eventually admitted he did not actually work for these institutions, but rather taught workshops lasting only two or three days on their campuses. But Klink was unable to find any evidence to substantiate Grant's claims that he was a lecturer, instructor, or workshop leader at any of these institutions. Klink detailed several other discrepancies, including Grant's representation at the time of his application that he was enrolled and pursuing a PhD at Columbia University, representations on his 1998 CV regarding his master's degree, claimed fellowships and law clerk experience, and discrepancies relating to a letter of recommendation.[1]

On March 8, Reck provided the Klink report to Grant, who, on April 25, responded with a 43-page response denying its findings. Grant again failed to provide documentation to support his representations or to contradict the report's findings. Thereafter, Reck made several attempts to meet with

---

[1] We do not detail each discrepancy found by Klink, as all the details are not necessary to complete our analysis.

Grant. On September 13, 2011, after more than twenty failed attempts to contact Grant, Reck informed Grant that she found he had "engaged in serious personal and professional misconduct[,]" which "present[ed] a severe threat to the academic integrity and reputation of the University." R. 110–10 at 2.[2] Under the University's Academic Handbook, personal misconduct includes dishonest conduct "not limited to, false accusation of misconduct, forgery, alteration or misuse of any university document, record or identification; and giving to a university official information known to be false." R. 119–6 at 36. Reck notified Grant that he was dismissed from the faculty effective December 31, 2011. The decision to terminate Grant was never submitted to the University Senate Promotion, Tenure and Reappointment Committee.

Reck informed Grant that, pursuant to the University's Academic Handbook, he could request a hearing. The next day, Grant suggested that he planned to appeal Reck's decision. On September 26, 2011, Reck reminded Grant that he should submit his appeal as soon as possible to allow for a hearing before his date of dismissal. On December 19, 2011, just days before his December 31 dismissal date, Grant submitted a 283-page grievance to the Faculty Board of Review ("Faculty Board"). But, again, Grant provided no documentation to substantiate his credentials or dispute Klink's findings.

Beginning in January 2012, the Faculty Board gathered information from Reck and Grant and attempted to schedule a hearing. Eight months later, on August 1, 2012, Grant confirmed with the Faculty Board Chair that he still wished to

---

[2] All record cites are to the record in the United States District Court for the Southern District of Indiana, Case No. 1:13-cv-00826-TWP-DML.

have a hearing in his case. After weeks of unsuccessful attempts to find a mutually agreeable time for the hearing, Grant terminated the Faculty Board process on August 28, 2012 by indicating that he no longer wished to have a hearing.

### C. District Court Proceedings

Grant filed suit against Guillaume, Reck, President Michael A. McRobbie, Indiana University, Indiana University South Bend, and the Trustees of Indiana University (collectively "the defendants") in connection with his termination. In his First Amended Complaint, Grant alleged twenty-six causes of action. The district court partially granted the defendants' motion for judgment on the pleadings. The defendants then filed a motion for summary judgment to dispose of the remaining claims, which the district court granted. It found that Grant, who "did not include a substantive fact section in his response brief and rarely cited specific facts in support of his arguments[,]" had failed to submit any evidence to support his claims and had shown no material dispute of fact that required trial. *Grant v. Trustees of Indiana Univ.*, No. 113-CV-00826-TWP-DML, 2016 WL 12222344, at *1 (S.D. Ind. Mar. 28, 2016).

## II. ANALYSIS

On appeal, Grant argues that the district court erred in granting summary judgment to the defendants on five of his claims: (1) discrimination on the basis of race; (2) retaliation for filing affirmative action complaints; (3) denial of due process of law; (4) defamation in the *South Bend Tribune*; and (5) breach of a contract created by the University handbook.

The question on summary judgment is whether the defendants have shown that there is no genuine dispute as to

any material fact and are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment *de novo*, resolving all factual disputes and drawing all reasonable inferences in favor of Grant, the non-moving party. *Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016). But Grant is only entitled to the benefit of inferences supported by admissible evidence, not those "supported by only speculation or conjecture." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and quotation marks omitted).

As the "'put up or shut up' moment in a lawsuit," summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial. *Harney v. Speedway Super-America, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof. *Packer v. Tr. of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015). Grant has not met this burden. To begin, his Amended Response in Opposition to the Defendants' Motion for Summary Judgment (Grant's "response") included a mere three-sentence "Statement of Material Facts in Dispute," which stated:

> Plaintiff is an African American who was an award winning tenured faculty member at Indiana University South Bend for more than a decade. After Plaintiff complained of discrimination and retaliation, Defendant Reck fired Plaintiff, alleging that he misled Indiana University with

his alleged 1998 resume (curriculum vitae), despite the fact that Plaintiff was cleared by the Faculty Misconduct Committee and not afforded a hearing prior to termination. Plaintiff disputes many of the material facts designated by Defendants.

R. 118 at 1.

In the rare instances where Grant's response to the defendants' motion alleged facts to support his arguments, he often failed to cite to admissible evidence supporting such assertions. Elsewhere, Grant simply supported his factual assertions by a general citation to an attached appendix, contrary to Southern District of Indiana Local Rule 56-1 requiring particularity–a rule we have long upheld. *Packer*, 800 F.3d at 848. And Grant, who is *pro se* on appeal, was represented by counsel in the district court so we are not obligated to liberally construe his filings. *C.f. Nichols*, 755 F.3d at 600. On appeal, Grant attempts to identify and argue facts supporting his case. But "[w]e will not consider factual arguments that were not raised below nor … evidence that was not properly cited to the court below." *Packer*, 800 F.3d at 849. For the reasons below, we agree with the district court and affirm summary judgment in favor of the defendants on all claims Grant pursues on appeal.

### A. No Evidence of Discrimination or Retaliation

We consider Grant's discrimination and retaliation claims together, as Grant combines his arguments when asserting these claims. Grant relied on the so-called indirect method of proof to establish his discrimination and retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). But after this case was briefed on appeal, we discarded the long-standing practice of distinguishing between "direct"

and "indirect" evidence in analyzing discrimination claims. *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760 (7th Cir. 2016). To be clear, the *McDonnell Douglas* indirect method of proof remains "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). However, it is not the only method of establishing a triable issue of intentional discrimination. Neither is it "the only way to assess circumstantial evidence of discrimination." *Id*. Instead, the appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a discriminatory or retaliatory motive caused Grant's termination? *Williams v. Office of the Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016).

On appeal, Grant contends that several pieces of evidence point to an illicit motive. However, since these arguments and citations were not included in his response to the defendants' motion, we will not consider it on appeal. As we have said before, "[i]t would be unfair to both the [defendants] and the district judge" for us to find there exists a material dispute of fact precluding summary judgment based on evidence offered for the first time on appeal, "when the district court was never alerted to those evidentiary grounds and the [defendants] did not have the opportunity to address them below." *Packer*, 800 F.3d at 849. Instead, Grant's response to the defendants' motion can be boiled down to two arguments:[3] (1)

---

[3] Grant also argues, pursuant to the traditional *McDonnell Douglass* indirect method of proof, that the district court erred in finding that he failed to offer a comparator. However, he only referenced a comparator in his

Guillaume had a discriminatory motive that he imputed upon Reck to influence her decision to terminate Grant (*i.e.*, the "cat's paw" theory of liability); and (2) Reck's proffered reason for terminating Grant–that Grant had committed serious misconduct by making ongoing misrepresentations of his credentials–was merely pretextual.

Under the cat's paw theory of liability, when a biased subordinate who lacks decision-making authority uses a "formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action," the biased subordinate's actions are evidence of discrimination. *Nichols*, 755 F.3d at 600 (citation and quotation marks omitted). This theory requires Grant to show that Guillaume "actually harbored discriminatory animus against him[,]" which he has not done. *Id*. at 604. In his response, Grant merely offered a conclusory statement, with no citation to any record evidence. *See* R. 118 at 14 ("[I]t is reasonable to assert that [Reck] had been manipulated by Defendant Guillaume, her subordinate, who does have such a [discriminatory] motive when he intended to bring about adverse employment action against Plaintiff."). Grant has also failed to show that Guillaume's "input was a proximate cause of [Grant] getting fired." *Nichols*, 755 F.3d at 604. First, Grant never rebutted the defendants' assertion that Guillaume did not have any input or influence on Grant's case after submitting it to Reck over a year before Grant's termination. Next, as we discuss below, Grant offered no evidence showing that Reck did not rely solely on Klink's findings in reaching her

First Amended Complaint and it is well-established that a non-moving party cannot rest on its pleadings when responding to a motion for summary judgment. *Harney*, 526 F.3d at 1104. So, we do not consider this argument on appeal.

decision to terminate Grant. Thus, he cannot survive summary judgment on a cat's paw theory of liability.

Next, Grant correctly states that "[i]f Plaintiff can raise a genuine issue about Defendant Reck's honesty … the case may need to be tried." R. 118 at 14. However, Grant offered no evidence that Reck's "stated nondiscriminatory reason was a lie intended to mask unlawful discrimination." *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Id*. (citation and quotation marks omitted). The evidence supports Reck's assertion that she believed Grant's continuing misrepresentations of his credentials rose to the level of serious personal misconduct worthy of his termination. And the court "is not a super personnel department that second-guesses employers' business judgments." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) (citation and quotation marks omitted). Even so, Grant offered no evidence to show that Reck did not honestly believe she could terminate him for his misrepresentations. And the Board of Trustees clearly agreed with Reck when it formalized Grant's termination on these grounds. *See* R. 119–14 at 17.

Grant has also provided nothing to demonstrate that any disputed issue of fact exists regarding the accuracy of the Klink findings, which formed the basis of Reck's belief that Grant misrepresented his credentials. Though Klink's findings need not be true for Reck to have honestly relied upon the report, Grant may have been able to show pretext if, for example, he had demonstrated that Klink's report was inaccurate or biased and that he had brought such inaccuracies or

biases to Reck's attention. However, Grant offers no evidence that Klink was used as a shield to cover-up Guillaume's conduct in imputing his discriminatory intent upon Reck. Grant cannot rely on wholly conclusory statements without a scintilla of evidence to overcome summary judgment. Because the evidence does not permit a reasonable fact-finder to conclude that Reck's proffered reason for terminating Grant was pretextual, the district court properly granted summary judgment to the defendants on Grant's discrimination and retaliation claims.

### B. No Deprivation of Procedural Due Process

Grant next alleges he was deprived of due process pursuant to 42 U.S.C. § 1983. We conduct a two-fold analysis of procedural due process claims. *Pugel v. Bd. of Trustees of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). We must first determine whether Grant was deprived of a protected interest. If we find that he was, we must then determine what process Grant was due. *Id*. The record reflects that, as a tenured professor at IUSB, Grant could only be terminated for good cause. It is well-established that a public employee who can only be terminated for good cause has a constitutionally protected property interest in continued employment. *See Carmody v. Bd. of Tr. of Univ. of Illinois*, 747 F.3d 470, 474 (7th Cir. 2014); *Harbaugh v. Bd. of Educ. of City of Chicago*, 716 F.3d 983, 986 (7th Cir. 2013); *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985). Because Grant was fired, he was deprived of his protected interest in continued employment.

We must next determine what process Grant was due. He maintains that the defendants denied him due process by terminating him without following the process outlined in the

University's handbook. We have tirelessly reminded litigants that our determination of whether the requirements of *federal* due process were satisfied is different from a determination of whether there was perfect compliance with an institution's rules. The process outlined in the IUSB handbook does not constitute the process required by the federal Constitution. *See Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993). Instead, due process "is flexible and requires only such procedural protections as the particular situation demands." *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (citation and quotation marks omitted). The cornerstone of due process is notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and quotation marks omitted). Generally, the adequacy of the post-termination process informs our analysis of the sufficiency of the pre-termination process. *See Carmody*, 747 F.3d at 474. However, Grant's "decision to bow out of the post-termination hearing–a decision he made freely–forecloses his due process claim to the extent it is premised on that hearing." *Id*. at 479.[4] So, we need only analyze the sufficiency of the University's pre-termination process. *See Loudermill*, 470 U.S. at 545.

We must balance three factors to determine whether the University's pre-termination process failed to meet the Constitutional minimum: (1) the private interest affected by the

---

[4] Grant contends that he did not waive his right to argue the insufficiency of his post-termination hearing based on *Baird v. Board of Education for Warrant Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685 (7th Cir. 2004). We are not persuaded by his argument, since, unlike the plaintiff in *Baird*, Grant chose not to accept or appear at the available proceedings. *See id.* at 695.

official action; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the University's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013) (brackets omitted) (citation and quotation marks omitted). The first factor indisputably favors Grant as he has a substantial interest in retaining his job. *See Homar*, 520 U.S. at 932 (recognizing the "severity of depriving someone of the means of his livelihood").

In considering the second factor, the evidence shows Grant was afforded notice and a detailed explanation of the charges and the evidence against him at every step of the two-year process (from 2009 until his termination on December 31, 2011). Grant was also provided with ample and meaningful opportunity to be heard and to refute the charges against him, as demonstrated by the numerous written responses he submitted, ranging from 42 to 300 pages in length, and meetings with University officials. There is no evidence that these opportunities to be heard were not meaningful. Furthermore, the evidence shows that the University, not Reck, hired Klink, an independent investigation firm with no bias or stake in the outcome of its investigation, and Grant was provided with the opportunity to be heard by Klink, but refused to take advantage of this opportunity. There is also no value to additional procedural safeguards here. While we have said that "the right to additional procedural protections does not depend on a demonstration of 'certain success,'" the deprivation alleged must involve issues that "plausibly would have prevented an erroneous deprivation." *Clancy v. Office of Foreign Assets Control of the U.S. Dep't of Treasury*, 559 F.3d 595, 601

(7th Cir. 2009). Even after years of discovery in this suit, Grant has not offered any evidence that the charges against him are false.

The final factor also weighs in favor of the defendants. Additional procedures would be an unnecessary burden on the defendants, who have a legitimate interest in protecting the integrity of the University. It is reasonable to believe that the University's reputation, as a state institution subject to accrediting agencies, government bodies, and public criticism, rests partially upon its retention of faculty with verified credentials. And, as our analysis of the second factor showed, additional procedures could not plausibly have prevented an erroneous deprivation. Here, the balance clearly shows that the pre-termination process Grant received complies with the requirements of due process, and the district court properly disposed of this claim on summary judgment.

### C.  No Specific Evidence to Support Defamation Claim

A cornerstone of a defamation claim under Indiana law is the falsity of any alleged defamatory statement. *Trail v. Boys & Girls Club of Nw. Indiana*, 845 N.E.2d 130, 136 (Ind. 2006). This is where Grant's claim fails. In his response to the defendants' motion, Grant makes a broad, unsupported assertion that statements in the *South Bend Tribune* articles are false. But rather than point to any specific statement or cite any specific evidence, Grant merely cites to his 12-page attachment of various newspaper articles and to Reck's entire 237-page deposition, in violation of Southern District of Indiana Local Rule 56-1. And we refuse to "scour the record in search of evidence to defeat a motion for summary judgment[.]" *Harney*, 526 F.3d

at 1104. Therefore, the district court properly granted the defendants' motion for summary judgment on Grant's defamation claim.

### D. No Evidence of a Contract

Finally, Grant contends that when he was granted tenure, the University entered into a contract with him, governed by the University's handbook. He alleges that the University breached this contract by terminating him without following the IUSB handbook's outlined procedure. However, Indiana University's handbook cannot form the basis of any contract alone, as it expressly disclaims the creation of any legal rights and applies this disclaimer to all campus-specific handbooks. *See Packer*, 800 F.3d at 853. Grant offered no evidence to overcome the handbook's disclaimer, so his contractual theory is wholly unsupported. The district court properly disposed of this claim on summary judgment.

### III. CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of the defendants on all claims.